# United States Court of Appeals
## For the First Circuit

No. 06-1260

KATHLEEN TORRES-NEGRÓN,

Plaintiff, Appellant,

v.

MERCK & COMPANY, INC.; GERARDO GONZÁLEZ;
CONJUGAL PARTNERSHIP GONZÁLEZ-DOE; MÓNICA DÍAZ;
CONJUGAL PARTNERSHIP DOE-DÍAZ; RICARDO SPINOLA;
CONJUGAL PARTNERSHIP SPINOLA-DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Torruella, Circuit Judge,
Baldock,[*] Senior Circuit Judge,
and Howard, Circuit Judge.

Marcelle Martell-Jovet, with whom Yolanda V. Toyos-Olascoaga and Ramos González & Toyos Olascoaga Law Offices were on brief, for appellant.
Anabel Rodríguez-Alonso, with whom Mariela Rexach-Rexach and Schuster & Aguiló LLP, were on brief, for appellee.

May 23, 2007

---

[*] Of the Tenth Circuit, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>.  Plaintiff-appellant Kathleen Torres-Negrón sued her employer, Merck Sharp & Dhome (I.A.) Corp. ("Merck-PR") and Mónica Díaz, Human Resources Director for Merck-PR, for discrimination based on sex, national origin, and disability, and for violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") and various state statutes.  Torres appeals the district court's grant of summary judgment in favor of Merck-PR and Díaz on all claims.  After careful consideration, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. <u>Factual Background</u>

Torres worked for Merck-PR from March 1, 1989 until she was terminated on October 19, 2001.  She worked as a sales representative at Merck-PR from 1989 until 1999, at which time she was transferred to Merck Sharp & Dhome de Mexico S.A. de C.V. ("Merck-Mexico") on a temporary assignment.  At all times during her employment at Merck-Mexico, Torres remained the employee of Merck-PR, was paid by Merck-PR in U.S. currency,[1] and maintained her U.S. employee benefits as a U.S. employee abroad.  Before her transfer to Merck-Mexico, Torres's work performance was satisfactory, even exemplary.  Both Merck-PR and Merck-Mexico are subsidiaries of Merck & Company ("Merck & Co.").

---

[1]    Merck-Mexico reimbursed Merck-PR for a portion of Torres Negrón's salary.

## A.  Alleged Harassment and Discrimination at Merck-Mexico

Torres alleges that from her first day at work in Mexico, she endured continuous harassment and discrimination.  She claims that her colleagues at Merck-Mexico made negative and harassing comments about her gender, her U.S. citizenship, her U.S. salary, and her Puerto Rican accent.  In 2001, Torres was reassigned within Merck-Mexico to Ricardo Spinola's business unit.  Torres claims that things became worse for her under Spinola's supervision because of his derogatory comments about her being a Puerto Rican woman.  When Torres complained to Spinola that he was harassing her and threatened to report him to Merck & Co.'s headquarters in New Jersey, he allegedly warned her that if she did so, she would "face the consequences."  Torres claims that as a result of this harassment, she began suffering headaches, hypertension, and anxiety.

Throughout her tenure in Mexico, Torres had constant contact with Merck-PR.  Three times a year, she participated in meetings that included representatives from Merck-PR, and in August 2001, Torres spent a week in Merck-PR's offices on a temporary assignment to assist in relaunching a product.  Torres never complained about her work environment in Merck-Mexico during these visits.

## B. Employee Misconduct

Merck & Co., Merck-PR's parent company, has a corporate business ethics policy applicable to all its subsidiaries. The policy specifically states that "[a]cceptance of a Merck executive or management position at any level includes acceptance of responsibility to uphold the Company's policies governing ethical business practices." It provides that

> [c]orporate conduct is inseparable from the conduct of individual employees in the performance of their work. Every Merck employee is responsible for adhering to business practices that are in accordance with the letter and the spirit of the applicable laws and with the ethical principles that reflect the highest standards of corporate and individual behavior. Since only such behavior is consistent with Merck's traditions, and since such behavior is essential to the success of its business endeavors, the Company will not accept anything less. Like integrity of product, integrity of performance is a Merck standard whenever we do business, and ignorance of the standard is never an acceptable excuse for improper behavior.

In addition, the Business Ethics policy specifically requires that "[a]ll transactions . . . be accurately reflected in the Company's books and records to permit their audit and control. Managers at all levels are responsible for the completeness of the document and for ensuring that funds are spent for the described purposes." The policy also counsels that "[e]mployees who may be undecided about whether contemplated actions are within the limits of legality or propriety should seek guidance from the Office of Ethics or the

Legal Department before actions are taken." Merck-PR provided Torres with a copy of this policy on a yearly basis.

Toward the end of August 2001, the human resources director for Merck-Mexico, Gerardo Gonzáles, alerted Jimmy Angueira, Senior Director in Charge of Latin America Human Health at Merck & Co., that Torres had been misusing company resources by shipping personal packages using Merck-Mexico's corporate courier account. In turn, Angueira forwarded Mónica Díaz, Human Resources Director for Merck-PR, an email from Gonzáles detailing the problem:

> Kathy Torres has been misusing Companies [sic] resources, making DHL personal shipments with charge to MSD. As [per] a preliminary report from Finance, these shipments have been happening for more than a year, there are more than [fifteen] shipments totaling $2,100 dollars. Since she is a Product Manager, she has a grant to use this service for business related issues, but neither DHL nor MSD hold evidence that she paid with her own money these shipments.

Following up on this information, Díaz (Merck-PR) spoke directly with Gonzáles (Merck-Mexico) regarding Torres's use of the corporate courier account. On October 5, 2001, Gonzáles met with Torres to discuss the shipments at issue. Torres admitted that thirteen out of nineteen shipments she had sent using the corporate courier account were for personal purposes. On October 8, 2001, Torres sent Gonzáles an email detailing the personal shipments she had made and explaining that due to a "personal omission she had

-5-

not given the matter the required follow-up and not made payment for the same within a reasonable time." Torres subsequently paid for her use of the courier service to ship personal packages. Gonzáles (Merck-Mexico) forwarded Torres's email admitting the use of corporate resources for personal reasons to Díaz (Merck-PR) and Angueira (Merck & Co.), and advised them of the conversation he had with Torres.

After receiving this information, Díaz (Merck-PR), Angueira (Merck & Co.), and César Simich, Managing Director for Merck-PR, discussed the matter and decided to recommend the termination of Torres's employment. The recommendation was approved by Grey Warner, Senior Vice President for Latin America Human Health at Merck & Co. Gonzáles (Merck-Mexico) informed Torres of the termination decision in Mexico on October 18, 2001. Pursuant to Merck & Co. company procedures, Torres's relocation to Puerto Rico was handled by the Merck & Co. Internal Assignment Division.

Torres claims that after being terminated, Merck-PR did not pay her last paycheck, did not issue her W-2 form, did not pay the state and federal taxes that were withheld from her salary, and did not properly notify her of her right to continued medical coverage as required by COBRA.

## II. **Procedural Background**

Torres filed suit in the United States District Court for the District of Puerto Rico on December 24, 2002 against Merck-PR,[2] Spinola (Merck-Mexico), Díaz (Merck-PR), and González (Merck-Mexico) claiming discrimination based on nationality and gender, and retaliation under Title VII; discrimination under the Americans with Disabilities Act ("ADA"); violation of the COBRA; and violation of various state statutes.

On June 13, 2005, the district court dismissed all of Torres's claims against Spinola and González, and Torres's federal claims against Díaz. On September 12, 2005, Díaz and Merck-PR filed a motion for summary judgment as to Torres's remaining claims against them. On December 12, 2005, the court entered summary judgment in favor of Díaz and Merck-PR, dismissing all of Torres's federal claims with prejudice and her local claims without prejudice.

## III. **Standard of Review**

Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review a district court's order granting

---

[2] Although Merck & Co. appears as a named party in this appeal, Torres's complaint was filed against Merck-PR and Merck-PR appears to be defending this appeal. Nothing in the record explains this switch in appellees.

summary judgment de novo, looking at the record in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor. See Rodríguez v. Smithkline Beecham, 224 F.3d 1, 5 (1st Cir. 2000). Nevertheless, the non-moving party may not rest merely upon the allegations or denials in its pleading. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). Instead, the non-moving party "must set forth specific facts showing that a genuine issue 'of material fact exists as to each issue upon which she would bear the ultimate burden of proof at trial.'" See id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The evidence presented by the non-moving party may not be "conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

### IV. **Title VII - Hostile Work Environment**[3]

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

---

[3] Torres also brought a wrongful termination claim under Title VII, which the district court dismissed on summary judgment. Torres does not appeal this decision.

conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). To succeed in a hostile workplace environment claim, Torres must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher v. City of Boca Ratón, 524 U.S. 775, 787-89 (1998).

On summary judgment, Merck-PR claimed that Torres failed to satisfy the sixth element of this test[4] and the district court agreed, dismissing the claim on the ground that "employer liability cannot attach for Plaintiff's claim for hostile work environment."

---

[4] Merck-PR did not argue that dismissal was appropriate based on the other elements of the hostile work environment test because "relevant discovery regarding the same [was] still outstanding" at the time of the motion. The district court decided only the issue of the sixth element. We therefore examine only the employer liability question.

-9-

An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the victim's: Merck-PR is vicariously liable if Torres's supervisor at Merck-PR created a hostile work environment,[5] see Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998), but if a co-worker created the hostile work environment, Merck-PR will be held liable only if it was negligent either in discovering or remedying the harassment, see Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002). Other circuits have addressed the question of employer liability in the case of harassment by non-employees, i.e., third parties. Those courts seem to be in general agreement that such cases should be analyzed using the same standard that is applied in the case of co-employee harassment. See, e.g., Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cr. 1998); Folkerson v. Circus Circus Enters., Inc., 107 F.3d 754, 756 (9th Cir. 1997).

The district court applied the negligence standard of employer liability because it found that Torres's alleged harassers

---

[5] An employer's vicarious liability for an actionable hostile work environment created by a supervisor is subject to an affirmative defense, which may only be asserted where no tangible employment action is taken. See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 764-65. Under the Faragher/Ellerth defense, the employer may avoid responsibility if it shows that it "exercised reasonable care to prevent and correct promptly" the harassment and that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. Merck-PR did not assert this defense either at summary judgment or on appeal.

-10-

were neither her supervisors nor her co-workers, but rather "third parties" for purposes of Title VII liability. The district court noted that Merck-PR and Merck-Mexico were "separate and independent legal entities" and that neither one controls the day-to-day operations of the other. The district court further found that while Torres was at all times employed by Merck-PR, Spinola was at all times an employee of Merck-Mexico. As such, the district court considered Spinola a non-employee, thus limiting Merck-PR's liability to negligence.

Torres's theory of employer liability was that Merck-Mexico and Merck-PR together constituted a single employer, which warrants vicarious liability to Merck-PR.[6] Under the "single

---

[6] Torres also argued, in the alternative, that Merck-PR is strictly liable for Merck-Mexico's conduct under a joint-employer liability theory. However, joint-employer liability does not by itself implicate vicarious liability. The basis for the finding that two companies are "joint employers" is that "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Rivas v. Federación de Asociaciones Pecuarias de P.R., 929 F.2d 814, 820 n.17 (1st Cir. 1991) (quoting NLRB v. Browning-Ferris Indus., Inc., 691 F.2d 1117, 1122-23 (3d Cir. 1982)). "[T]he 'joint employer' concept recognizes that the business entities involved are in fact separate but that they share or co-determine those conditions of employment." Id. (emphasis in original). Thus, a finding that two companies are an employee's "joint employers" only affects each employer's liability to the employee for their own actions, not for each other's actions, as Torres would have us hold. See Virgo v. Rivera Beach Assoc., Ltd., 30 F.3d 1350, 1359-63 (3d Cir. 1994) (holding that two companies were joint employers and therefore liable to the employee, but using agency principles to determine the extent of one employer's liability for the other employer's actions).

employer" doctrine, two nominally separate companies may be so interrelated that they constitute a single employer subject to liability under Title VII.  See NLRB v. Browning-Ferris Indus., Inc., 691 F.2d 1117, 1122 (3d Cir. 1982).  The "single employer" (also "integrated employer") test may apply in cases where "liability is sought to be imposed on the legal employer by arguing that another entity is sufficiently related such that its actions . . . can be attributable to the legal employer."  Engelhardt v. S.P. Richards Co., 472 F.3d 1, 4 n.2 (1st Cir. 2006) (applying the single employer test to a claim under the FMLA, but citing to its application in Title VII cases).

But the district court rejected that argument, holding that

> even assuming arquendo that Merck Puerto Rico and Merck Mexico could both be considered Plaintiff's employers for purposes of the Title VII analysis, we have no evidence to sustain a finding that Merck Puerto Rico had any control over the actions of Mr. Spinola, a Merck-Mexico employee.  As such, there is no evidence to sustain a finding that at any time Mr. Spinola was acting as an agent of Merck Puerto Rico.

The district court did not address whether Merck-PR and Merck-Mexico could, in fact, be considered a single employer.  On appeal, Merck-PR avoids this question, arguing that "while Spinola was a supervisor, he was a supervisor for Merck-Mexico, not Merck-PR.  As such, he could not, and, in fact, did not, bring Merck-PR's

-12-

official power to bear on Torres."[7]  Torres reiterates her single-employer liability argument, claiming that the district court erred in using a negligence standard applicable to the actions of co-workers and third parties to evaluate Merck-PR's liability for her Merck-Mexico supervisor's discriminatory and harassing conduct. We think there is a triable issue of fact on this question.

The flaw in both the district court's and Merck-PR's analyses is that they ignore the fact that if Merck-Mexico and Merck-PR are considered to be one and the same company, the agent

_____

[7] Merck-PR argues that the single-employer doctrine is irrelevant in this case because it useful only to determine whether an entity is an employer under Title VII.  First, this is descriptively inaccurate. See, e.g., Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005) ("There is well-established authority under [the single-employer] theory that, in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer" (emphasis added)); Sandoval v. City of Boulder, 388 F.3d 1312, 1322 (10th Cir. 2004) (applying the single-employer doctrine "[f]or purposes of finding shared liability" (emphasis added)); Schweitzer v. Advanced Telemarketing Corp., 104 F.3d 761, 763 (5th Cir. 1997) ("In civil rights actions, 'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise: a single employer.'" (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983) (emphasis added)).  Second, it is prescriptively unjustified. Indeed, the very purpose of the doctrine is to extend responsibility for discrimination beyond technical distinctions to promote the Title VII goal of eliminating employment discrimination. See Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 777 n.3 (5th Cir. 1997) (citing Baker v. Stuart Broad. Co., 560 F.2d 389, 391 (8th Cir. 1977)).  The absurd result of Merck-PR's argument is that under such an analysis, Torres's only bar to invoking the single-employer doctrine would be that she sued her legal employer, as opposed to its parent company.

(Spinola) of one (Merck-Mexico) automatically becomes the agent of the other (Merck-PR) for purposes of Title VII liability. That is, the question of Spinola's relationship to Merck-PR is answered by the single employer theory.

The factors considered in determining whether two or more entities are a single employer under the integrated-enterprise test[8] are: (1) common management; (2) interrelation between operations; (3) centralized control over labor relations; and (4) common ownership. Romano v. U-Haul Int'l, 233 F.3d 655, 662 (1st Cir. 2000). "All four factors, however, are not necessary for single-employer status." Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 (10th Cir. 1999); see also Pearson v. Component Tech. Corp., 247 F.3d 471, 486 (3d Cir. 2001). Rather, the test should be applied flexibly, placing special emphasis on the control of employment decisions. Romano, 233 F.3d at 666 ("We choose to follow the more 'flexible' approach . . . which focuses on employment decisions, but only to the extent that the parent exerts 'an amount of participation [that] is sufficient and necessary to

_____

[8] This Court has not yet decided what test is appropriate to determine whether an employer is liable under the single employer theory, but it has "identified three recognized methods for determining whether a single employer exists under Title VII: the integrated-enterprise test, the corporate law 'sham' test, and the agency test." Romano v. U-Haul Int'l, 233 F.3d 655, 665 (1st Cir. 2000). Torres's argument assumes the application of the integrated enterprise test and Merck-PR does not argue for a different test. We will therefore apply this widely recognized approach to address the single-employer issue in this case on summary judgment.

-14-

the total employment process, even absent total control or ultimate authority over hiring decisions.'" (quoting Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241 (2d Cir. 1995)).[9]

Applying the four-factor single employer test, we find that there is enough evidence in the record to survive summary judgment. With respect to the "interrelation between corporations" factor, there is ample evidence of a reciprocal relationship between Merck-PR and Merck-Mexico. First, the record shows that Merck-PR and Merck-Mexico perform substantially the same function. See Englehardt, 472 F.3d at 6 (finding "little, if any, evidence to suggest any interrelation between operations of the two companies," and noting that the nature of the two businesses was distinct -- one was in the auto-parts retailing business whereas the subsidiary was in the office-supply wholesaling business). There is also evidence of frequent interchange of employees between Merck-PR and Merck-Mexico, centralized Merck & Co. human resources and personnel policies, as well as a unified system through which all "expatriated" employees are funneled. See id. (finding no interrelation where the subsidiary was not a "division" of the parent company "whereby upper echelons of control are centralized and efficiencies are realized through consolidation of redundant administrative, human resource, and management functions").

_____

[9] This test is different (and more lenient) than the test we would apply to pierce the corporate veil. See Pearson, 247 F.3d at 486-487.

-15-

With respect to centralized control of labor relations --
the "primary consideration in evaluating employer status," Romano,
233 F.3d at 666 -- there is a significant amount of evidence
weighing in favor of a single-employer finding.  As mentioned
above, Merck & Co. established company-wide human resources and
personnel policies applicable to all its subsidiaries.  Moreover,
the record shows that Merck-PR, Merck-Mexico, and Merck & Co. all
had substantial control over Torres's employment.  See id. at 7
(finding little evidence of centralized control of labor relations
where "[t]here is no evidence to suggest that [one of the
companies] deferred to [the other] in making hiring, firing,
assignment, scheduling, or compensation decisions").  Merck-PR paid
Torres, provided her benefits and retained the power to terminate
her.  Meanwhile, Merck-Mexico had virtually exclusive control over
her day-to-day employment and had substantial influence over the
ultimate decision to terminate her.

Torres's termination process itself evinces centralized,
top-down control over employment decisions.  The purported reason
for Torres's termination was the violation of a company-wide
professional ethics policy established by Merck & Co., applicable
to all its subsidiaries, including Merck-Mexico and Merck-PR.  See
id. (finding "no evidence that [the parent company] required [the
subsidiary] to adopt the same policies and programs," and therefore
no inference that "Defendants centrally determined both companies'

employment practices"). Moreover, the termination was ultimately approved by human resources personnel for Merck & Co.'s Latin American division, on Merck-PR's recommendation after consulting with Merck-Mexico.

Both Merck-PR and Merck-Mexico are subsidiaries of Merck & Co. As such, they share common ownership. However, we presently have no information about the first factor, management of the companies.

In sum, we think that the evidentiary record leaves a triable issue of fact as to whether Merck-PR and Merck-Mexico (and Merck & Co.) are one single employer for purposes of Title VII liability for a hostile work environment. Thus, we find that for purposes of summary judgment, Torres has presented sufficient evidence to establish Merck-PR's potential liability for her hostile work environment claim.

## V. ADA Claim

The district court similarly dismissed Torres's discrimination claim under the ADA, 42 U.S.C. §§ 12101 et seq., on the ground that Merck-PR did not know about her medical condition and therefore could not have had the discriminatory animus required under the ADA. See Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 251 (1st Cir. 2000) (describing the ADA's requirement that an employee establish that her employer's adverse employment decision was motivated by the employee's disability). The district court

-17-

did not address the extent to which Merck-Mexico or Merck-PR knew about Torres's medical conditions or potentially discriminated against her because of them. As under Title VII, the single employer test has been applied to determine liability under the ADA. See Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993 (6th Cir. 1997) ("Under the 'single employer' or 'integrated enterprise' doctrine, two companies may be considered so interrelated that they constitute a single employer subject to liability under the ADEA and/or the ADA."). Thus, for the same reasons articulated as to the Title VII claim, we reverse the district court's dismissal of Torres's ADA claims.

## VI. Retaliation Under Title VII

To establish a prima facie showing of retaliation, a plaintiff must prove that (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003). An employee has engaged in an activity protected by Title VII if she has either opposed any practice made unlawful by Title VII, "or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 42 U.S.C. § 2000e-3(a); see also Dressler, 315 F.3d at 78.

It is uncontested that Torres engaged in protected activity when Torres filed her charge of discrimination with the

-18-

EEOC on November 28, 2001 -- a little over a month after her termination. Torres claims that the retaliatory "adverse employment action" consisted of Merck's failure to (1) timely pay her last paycheck; (2) provide her W-2 forms; (3) timely pay her state and federal taxes; (4) pay her Christmas bonus; and (5) make a good faith effort to send her required COBRA notice.

The district court first held that none of Torres's allegedly retaliatory acts "amount to adverse employment actions actionable under Title VII" because they "all took place once Plaintiff was no longer employed at Merck Puerto Rico." While this appeal was pending, however, the Supreme Court decided <u>Burlington Northern & Santa Fe Railway Co.</u> v. <u>White</u>, -- U.S. --, 126 S. Ct. 2405 (2006), changing the legal standard to be applied to retaliation claims under Title VII. While we express no opinion as to how this issue should be resolved, we think it proper to allow the district court to first address this issue in light of <u>Burlington</u>. Accordingly, we remand Torres's Title VII retaliation claim to the district court to the extent its viability depends on a finding of adverse employment action.

The district court went on to address alternative grounds on which to dismiss the specific allegations of retaliation. The district court held that Merck's failure to pay Torres's Christmas bonus was not actionable because of a lack of causal connection between the alleged retaliatory act and Torres's protected

-19-

activity. We agree. Torres filed her discrimination action on November 28, 2001 but the payment of those bonuses has been outstanding since December 1999. Without evidence of specific retaliatory animus motivating the non-payment of the bonuses after November 29, 2001, there is no reason to believe that Merck-PR decided not to pay Torres because she filed a claim of discrimination.

With respect to Merck's failure to pay Torres's withheld taxes, however, the district court held again that there was a lack of causal connection between the alleged retaliatory act and her protected activity because Merck-PR had outsourced this duty to an accounting firm. We do not think an additional link breaks the causal chain altogether. The fact that Merck-PR hired Ernst & Young to do a job does not absolve it from responsibility for getting the job done; more importantly, it does not strip Merck-PR from its power to prevent the job from being done.

The district court also dismissed Torres's retaliation claim based on Merck's failure to provide COBRA notice on the ground that the claim was preempted by the Employee Retirement Income Security Program ("ERISA"). ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described [in the statute]." 29 U.S.C. § 1144(a) (emphasis added). The term "State law" is defined by the statute as including "all laws, decisions, rules, regulations, or

other State action having the effect of law, of any State."  Id. § 1144(c)(1); see also Van Camp v. AT&T Info. Sys., 963 F.2d 119, 122 (6th Cir. 1992), overruled on other grounds by Warner v. Ford Motor Co., 46 F.3d 531 (6th Cir. 1995).  Because Torres's retaliation claim is brought under Title VII, a federal law, her claim is not preempted by ERISA.

Therefore, we remand to the district court Torres's retaliation claims based on Merck-PR's failure to pay her last paycheck, its failure to provide her W-2 forms, its failure to pay her Puerto Rico and federal taxes, and its failure to comply with COBRA requirements.[10]

## VII. **COBRA Compliance**

COBRA requires employers to give employees the opportunity to continue health care coverage for a specified period of time after a "qualifying event," at the employee's expense.  29 U.S.C. § 1161(a); see Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 103 (1st Cir. 2004).  Termination of employment is considered a qualifying event.  29 U.S.C. § 1163(2).  COBRA also requires employers to notify health care plan administrators of the termination within 30 days of the qualifying event.  Id. § 1166 (a)(2).  Thereafter, plan administrators have fourteen days to

_____

[10]  Apart from the discussion relating to the Christmas bonus and withheld taxes, the district court did not reach the issue of causation. We express no opinion as to whether Torres will be able to provide sufficient evidence on remand to establish the required causal connection for her retaliation claim.

-21-

notify the qualified beneficiary of her right to continued coverage. Id. § 1166(c).

Torres claims that Merck-PR did not comply with COBRA's notice requirements because it used her old address to notify her of her COBRA rights, despite the alleged fact that she called Merck-PR at some point after December 11, 2001 to inform the company of her new Puerto Rico address. Noting that Torres admitted to having her mail forwarded from her old address to her new Puerto Rico address, the district court dismissed Torres's COBRA claim holding that Merck-PR had substantially complied with COBRA's notification requirements because its notice was reasonably calculated to reach Torres. We disagree.

COBRA does not state how notice should be given. But "courts that have addressed the issue have held that 'a good faith attempt to comply with a reasonable interpretation of the statute is sufficient.'" Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1383-84 (10th Cir. 1997) (internal quotation marks omitted); see also, e.g., Degruise v. Sprint Corp., 279 F.3d 333, 336 (5th Cir. 2002) ("[E]mployers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails.") (internal quotation marks omitted); Branch v. G. Bernd Co., 764 F. Supp. 1527, 1534 n.11 (M.D. Ga. 1991) ("[C]ourts have generally validated methods of notice which are calculated to reach the beneficiary."), aff'd 955 F.2d 1574 (11th Cir. 1992). Several

-22-

courts have specifically found that employers are in compliance with § 1166(a) when they send COBRA notices via first class mail to an employee's last-known address. See Holford v. Exhibit Design Consultants, 218 F. Supp. 2d 901, 906 (W.D. Mich. 2002); Torres-Negrón v. Ramallo Bros. Printing, Inc., 203 F. Supp. 2d 120, 124-25 (D.P.R. 2002).

Merck-PR (through the third-party health care plan administrator) sent Torres a notice of her rights under COBRA on January 2, 2001 via certified mail to the address Torres had given when she worked at Merck-Mexico. Torres alleges that she informed Merck-PR of her new address in Puerto Rico in a telephone call made to the company mid-December 2001. Looking at the evidence in the light most favorable to Torres, we cannot say as a matter of law -- the standard we apply on summary judgment -- that Merck-PR made a good faith effort to comply with COBRA because there is a dispute as to the facts regarding whether Merck-PR knowingly sent the notice to the wrong address.

## VIII. Conclusion

We affirm the district court's dismissal of Torres's retaliation claim based on Merck-PR's failure to pay her Christmas bonus. We reverse the district court's order with respect to Torres's Title VII hostile work environment claim, her ADA claim, and her retaliation claim insofar as it is based on Merck-PR's failure to pay her last paycheck, its failure to provide her W-2

-23-

forms, its failure to pay her Puerto Rico and federal taxes, and its failure to comply with COBRA requirements, and remand for further proceedings.  In light of this conclusion, the district court should also reconsider the dismissal of Torres's supplemental claims.  Each party shall bear its own costs on appeal.

**<u>Affirmed in part, reversed in part and remanded</u>**.